IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

GOLD TIP, LLC, a Delaware limited   )
liability company,   )
  )
            Plaintiff,   )
  )
vs.   )
  )
CAROLINA CASUALTY INSURANCE   )
COMPANY, an Iowa corporation,   )
  )
            Defendant.   )

Civil No. 2:11-CV-00765-BSJ

**MEMORANDUM OPINION
& ORDER
(Fed. R. Civ. P. 56)**

```
┌─────────────────────────────────────┐
│            FILED                     │
│   CLERK, U.S. DISTRICT COURT         │
│   August 23, 2012 (11:00am)          │
│        DISTRICT OF UTAH              │
└─────────────────────────────────────┘
```

* * * * * * * * *

On August 24, 2011, Gold Tip ("plaintiff") filed its Complaint[1] commencing the above-

entitled action and invoking the diversity jurisdiction of this court pursuant to 28 U.S.C. §

1332(a)(1) (2006 ed.).[2]  Plaintiff seeks declaratory relief against Carolina Casualty Insurance

Company ("Carolina" or "defendant"), asserting that Carolina breached its duties under a

management liability insurance policy, and also asserting that defendant was obligated to defend

plaintiff in connection with a criminal investigation of plaintiff's chief executive officer (Tom

Zelenovic) by the Utah County Attorney's Office.[3]  Plaintiff is also seeking no less than

$180,000.00 in costs and attorney's fees that it incurred in conducting its own defense of that

_____

[1](*See* Pl.'s Compl., filed Aug. 24, 2011 (CM/ECF No. 2) ("Compl.").)

[2]28 U.S.C. § 1332(a)(1) provides:

> (a) The district courts shall have original jurisdiction of all civil actions
> where the matter in controversy exceeds the sum or value of $75,000,
> exclusive of interest and costs, and is between—
> (1) citizens of different States; . . .

[3](*See* Compl. at 41.)

investigation.[4]  Plaintiff also alleges that defendant is liable under a theory of breach of the implied covenant of good faith and fair dealing.[5]

On December 30, 2011, defendant filed a motion for summary judgment asserting that as a matter of law, "defendant properly denied coverage" because the "investigation [by the Utah County Attorney's Office] does not fall under the clear language of the policy."[6]  Defendant succinctly stated that "[t]he legal issue that must be determined by this court is whether the informal investigation conducted by the Utah County Attorney's office constituted a 'claim' thereby invoking coverage under the clear terms of the Policy."[7]  Predictably, defendant had determined that "the county attorney investigation was not a claim, as defined in the Policy."[8]

On January 30, 2012, plaintiff filed a cross-motion for summary judgment, asserting that

the defense of the Utah County Attorney's Office criminal and/or local
government investigation against Mr. Zelenovic was within the scope of a Claim
as defined by the management liability policy issued to Gold Tip by Carolina
Casualty, [and] that Carolina wrongfully denied coverage for the investigation and
is therefore liable to Gold Tip for all reasonable and necessary attorneys' fees and
costs arising out of the criminal investigation, plus interest, and attorneys' fees
incurred in enforcing the Policy.[9]

Defendant concedes that there is "no dispute that the Policy was in effect at the time of the informal investigation and there is no dispute that Zelenovic was a covered director or officer

---

[4](*See id.* at 14–15.)

[5](*See id.* at 15.)

[6](Def.'s Mot. for Summ. J., filed Dec. 30, 2011 (CM/ECF No. 16) ("Def.'s Mot.") at 1.)

[7](Def.'s Mem. in Supp. of Mot. for Summ. J., filed Dec. 30, 2011 (CM/ECF No. 17) ("Def.'s Mem.") at 4.)

[8](*Id.* at 5.)

[9](Pl.'s Cross-Mot. for Summ. J., filed Jan. 30, 2012 (CM/ECF No. 18) ("Pl.'s Cross-mot.") at 1–2.)

under the Policy."[10] Indeed, the parties "roughly agree to the pertinent facts in this case and the only issue is an interpretation of the governing language of the Policy at issue."[11]

**UNCONTROVERTED FACTS**

The parties agree that at pertinent times, Gold Tip, LLC and Tom Zelenovic were insured under a management liability policy issued by Carolina Casualty Insurance Company, Policy No. 6929907, with effective dates from March 11, 2010, through March 11, 2011.[12]

**Carolina's Management Liability Policy**

Carolina's Management Liability Policy ("the policy") reads in pertinent part that it shall pay on behalf of:

A.      Each and every **Insured Person** all **Loss** arising from any **Claim** first made against the **Insured Persons** during the **Policy Period** and reported to the **Insurer** in writing during the **Policy Period** or within 90 days thereafter, for any **Wrongful Act**, except and to the extent that the **Insured Entity** has indemnified the **Insured Persons**; . . . [13]

The policy defines a "**Claim**" as "a written demand for monetary or non-monetary relief including, but not limited to: 1. a civil, criminal, administrative, arbitration proceeding, or 2. Any proceeding brought or initiated by a federal, state or local government agency."[14]

The policy does not define the term "proceeding." However, the policy defines the term

---

[10](Def.'s Mem. at 4.)

[11](Def.'s Reply Mem. in Supp. of Def.'s Mot. for Summ. J. & Mem. in Opp'n to Pl.'s Cross-Mot. for Summ. J., filed Feb. 27, 2012 (CM/ECF No. 21) ("Def.'s Reply") at 2.) Defendant also states that "for purposes of these motions, defendant will accept the facts alleged by plaintiff." (*Id.*)

[12](*See* Def.'s Mem. Ex. J at DEF0003.)

[13](*Id.* Ex. J at DEF0036.)  All terms in bold are styled as such in the original document.

[14](*Id.*)

"**Loss**" as "**Damages** and **Costs of Defense**."[15] Finally, "**Costs of Defense**" means

> reasonable and necessary fees, costs and expenses . . . resulting solely from the investigation, adjustment, defense and appeal of a covered or potentially covered **Claim** against the **Insureds**, but excluding salaries, wages, overhead or benefit expenses associated with any **Insured**, or any amount covered by the duty to defend obligation of any other insurer. . . .[16]

### The Utah County Attorney's Office Investigation & Mr. Zelenovic's Subsequent Notice of Claim

In early October 2009, Jeff Robinson—Bureau Chief of the Bureau of Investigations for the Utah County Attorney's Office—"commenced a formal criminal investigation of Thomas Zelenovic" as a result of a complaint and documentation from a complaining party, "involving the sale of Gold Tip, Inc., to a newly created entity, Gold Tip, LLC, which was controlled by Mr. Zelenovic."[17]   The complaining party alleged that Mr. Zelenovic had engaged in communications fraud, and had filed a wrongful lien, both of which are felonies under Utah law.[18] Based on these allegations, Mr. Robinson believed there to be reasonable suspicion that Mr. Zelenovic had engaged in criminal conduct.[19]

Mr. Robinson interviewed many witnesses and reviewed numerous documents during the course of his investigation.[20] In July 2010, Mr. Robinson received a telephone call from Rodney G. Snow—counsel for Mr. Zelenovic—inquiring as to whether Mr. Robinson was engaged in a

---

[15](*Id.* Ex. J at DEF0037.)

[16](*Id.* Ex. J at DEF0036.)

[17](Aff. of Jeff Robinson, filed March 30, 2012 (CM/ECF No. 25-1) ("Robinson Aff.") ¶¶ 2, 4.)

[18](*See id.* ¶ 4.)

[19](*See id.* ¶ 5.)

[20](*Id.* ¶ 6.)

criminal investigation, and if so, whether the investigation was serious.[21] Mr. Robinson informed

Mr. Snow that Mr. Robinson was indeed conducting a criminal investigation, that the

investigation was serious, and "that Mr. Zelenovic was the primary suspect and target of the

investigation."[22]

    As a result, Mr. Snow requested the opportunity to meet with Mr. Robinson to determine

the nature of the investigation, to provide documents to Mr. Robinson, and to explain Mr.

Zelenovic's position regarding the allegations.[23]  Mr. Snow, along with Matthew Close—Mr.

Zelenovic's separate counsel from the law firm of O'Melveny & Myers—subsequently met with

Mr. Robinson to discuss the allegations.[24] Mr. Close and Mr. Snow provided Mr. Robinson with

"a number of documents and a transcript of a deposition that was important" to Mr. Robinson's

investigation.[25] On other occasions Mr. Snow also spoke with Mr. Robinson both via telephone

and at Mr. Robinson's office to discuss the allegations of criminal conduct.[26] Although Mr.

---

[21](*See id.* ¶ 8.)

[22](*Id.*)

[23](*Id.* ¶ 9; *see also* Def.'s Mem. Ex. A. (letter from Rodney G. Snow to Jeff Robinson, dated July 28, 2010, purportedly memorializing, in part, a previous telephone conversation between the two).)

[24](*See* Robinson Aff. ¶ 10; *see also* Def.'s Mem. Ex. B (letter from Rodney G. Snow to Jeff Robinson, dated September 16, 2010, purportedly memorializing, in part, the meeting between Messrs. Robinson, Snow, and Close, which occurred on a preceding Monday).) Also, a law firm based in Mexico—Bryan, and Gonzalez Vargas & Gonzalez Baz—also purportedly assisted Mr. Zelenovic in defense of the criminal investigation. (*See* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J., filed Jan. 30, 2012 (CM/ECF No. 19) ("Pl.'s Mem.") at 4.)

[25](*See* Robinson Aff. ¶ 10.)

[26](*See id.*)

Robinson spoke with Mr. Zelenovic's counsel, he never interviewed Mr. Zelenovic.[27]

Ultimately, Mr. Robinson characterized the criminal investigation as "complicated" and identified Mr. Zelenovic as the primary suspect.[28]  However, after Mr. Robinson and the Utah County Attorney's Office had reviewed the information obtained from witnesses and relevant documents, including the information submitted by counsel for Mr. Zelenovic, the Utah County Attorney's Office closed the case in December 2010, characterizing the allegations as unfounded.[29]

On September 30, 2010, Mr. Zelenovic, through counsel, sent Carolina a notice of claim and request for defense and indemnification under the insurance policy.[30] Ultimately, Mr. Zelenovic submitted invoices from the three law firms and requested reimbursement of $183,294.54 in attorney's fees and costs, styled as costs of defense of his criminal investigation.[31] Carolina denied coverage, arguing that the investigation was not a "**Claim**" under the language of the policy.[32]

---

[27](*See* Tr. of Hr'g, dated Apr. 9, 2012 (CM/ECF No. 27) at 7:3–7.)

[28](Robinson Aff. ¶ 11.)

[29](*See id.*)

[30](Pl.'s Mem. at 5; Def.'s Mem. Ex. G.)

[31](*See* Pl.'s Mem. at 6; Pl.'s Mem. Ex. A.) Although in its memorandum in support of its cross-motion for summary judgment plaintiff states that it only submitted bills from the California and Utah law firms, plaintiff appears to have attached billing records from a third law firm—presumably the Tijuana, Mexico firm—to Exhibit A of its memorandum. Plaintiff also attached a bill from a proprietor by the name of Northridge Investigative Service, Inc. (NIS). (*See* Pl.'s Mem. Ex. A at GT000122–GT000126, GT000261.)

[32](*See* Pl.'s Mem. at 6; *see also* Def.'s Mem. Ex. I (letter dated Apr. 2011 from Sonia D. Coleman, Claims Attorney for Carolina, addressed to Rodney G. Snow, Esq.) ("In closing, I regret that we continue to disagree over coverage for this matter, but we simply have different
(continued...)

**ANALYSIS**

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[33] On cross-motions for summary judgment, each party is a movant for summary judgment; thus, each party bears the burden of establishing that there is no genuine factual dispute and that it is entitled to a judgment as a matter of law.[34]

The parties agree that there is no genuine dispute as to any material fact. Indeed, both parties agree that—pursuant to the policy—the definition of "Claim" contains the term "proceeding," and it is the meaning of "proceeding" that forms the basis of the parties' dispute. Therefore, if this court adjudges the Utah County Attorney's Office investigation to be a "proceeding," then the investigation would thereby constitute a "Claim" under the policy,[35] and Carolina would be required to reimburse Mr. Zelenovic for the "reasonable and necessary fees,

---

[32](...continued)
views of the applicability of the Policy to the circumstances you have reported to us. We respect your contrary views, but we do not share them.").)

[33]*Valdez v. Squier*, 676 F.3d 935, 943 (10th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)).

[34]10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998).

[35]"The parties agree the only issue the Court needs to decide to determine coverage is whether the Utah County Attorney's Office criminal investigation of Mr. Zelenovic was a 'proceeding' thereby constituting a Claim under the Policy." (Pl.'s Mem. at 3.)

"The term 'proceeding', therefore, becomes the key to interpreting the scope of the Policy. If the Utah County Attorney's minimal contacts were a 'proceeding', coverage is extended. If the contacts were not a 'proceeding', then there is not duty to cover the attorney expenses under the Policy." (Def.'s Mem. at 6.)

costs and expenses . . . resulting solely from the investigation."[36]

Under Utah law, an insurance policy is a contract between the insured and the insurer and "is construed pursuant to the rules applied to ordinary contracts."[37]  "Questions of contract interpretation not requiring resort to extrinsic evidence are matters of law."[38]  Because insurance policies are typically drafted by insurance company attorneys who are duty-bound to protect the interests of their clients, "insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance."[39]

If a policy's terms are unambiguous, there is no need for a presumption in favor of the insured and the language is construed according to its usual and ordinary meaning.[40]  However, if policy language is ambiguous, then doubt is resolved against the insurer and in favor of coverage.[41]  A policy's language "may be ambiguous because it is unclear or omits terms or . . . if the terms used to express the intention of the parties may be understood to have two or more plausible meanings."[42]

---

[36](Def.'s Mem. Ex. J at DEF0036.)

[37]*Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993).

[38]*Zions First Nat'l Bank v. National Am. Title Ins. Co.*, 749 P.2d 651, 653 (Utah 1988).

[39]*U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521–22 (Utah 1993) (quoting *Richards v. Standard Acc. Ins. Co.*, 58 Utah 622, 200 P. 1017, 1020 (1921)).

[40]*Alf*, 850 P.2d at 1274.

[41]*Id.*

[42]*Id.* at 1274 (internal quotation marks omitted).

In their competing motions for summary judgment, the parties present differing interpretations of the insurance policy's term "Claim." However, ambiguity does not exist simply because the parties provide differing interpretations of a policy term.[43]  Rather, the court must determine whether both parties' interpretations are plausible.[44]  If both are plausible, then the policy's language is ambiguous, and doubt should be resolved in favor of coverage.

To grant Gold Tip's motion for summary judgment, the court must find that (a) the investigation was plausibly "a written demand for monetary or non-monetary relief" and that either (b) the investigation was plausibly a "proceeding" under the policy's language or (c) the phrase "including, but not limited to" plausibly expanded the definition of "claim" to encompass the investigation. Both parties have presented differing yet plausible interpretations of the term "Claim." Thus, the policy language was ambiguous and should be construed in Gold Tip's favor.

**The Investigation Was Plausibly a "written demand for . . . non-monetary relief"**

This court has previously held that a "written demand for . . . non-monetary relief" can encompass a letter that coerces conduct of the policyholder through the threat of using the legal process to compel that conduct.[45]  In *Quaker State Minit-Lube, Inc. v. Fireman's Federal*

---

[43]*Treasure Valley Transit v. Philadelphia Indem. Ins. Co.*, 88 P.3d 744, 747 (Idaho 2004); *see also Alf*, 850 P.2d at 1274–75 ("[P]olicy terms are not necessarily ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests.")

[44] *See Alf*, 850 P.2d at 1274.

[45]*Cf. Quaker State Minit-Lube, Inc. v. Fireman's Fed. Ins. Co.*, 868 F. Supp. 1278, 1309 (D. Utah 1994) (quoting *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 75 (E.D. Mich. 1987)) (stating that "coverage does not hinge on the form of action taken or the nature of the relief sought, but on an actual or threatened use of legal process to coerce payment or conduct (continued...)

*Insurance Company*, the EPA issued a potentially responsible party letter asking a company to participate in the cleanup of an environmental hazard.[46]  This court noted that the letter effectively compelled action from the company by threatening to enter compulsory orders or commence a lawsuit if the company did not comply.[47] Thus, the court held that the insurance policy's language, which covered "any suit against the insured," embraced the EPA's administrative actions even though a lawsuit was never filed in court.[48]

In the present case, the threat of a potential criminal indictment coerced Gold Tip to participate in the investigation. The Utah County Attorney's Office requested document production and a meeting between Mr. Zelenovic and Mr. Robinson. Gold Tip reasonably believed that if it refused to cooperate, the Utah County Attorney's Office would be more inclined to criminally indict Mr. Zelenovic. Thus, the company was essentially coerced to cooperate in the investigation under the threat that the Utah County Attorney's Office would use the legal process to compel such conduct. Accordingly, pursuant to the policy, the letters and requests from the Utah County Attorney's Office were plausibly "written demands for . . . non-monetary relief."

### The Investigation Was Plausibly a "criminal" or "local government" "proceeding" Under the Policy's Language

Carolina argues that the investigation was informal and voluntary; therefore, the

---

(...continued)
by the policyholder").

[46]*See Quaker* State, 868 F. Supp. at 1285.

[47]*See id.* at 1309–10.

[48]*See id.* at 1310.

investigation never rose to the level of a "proceeding."[49] Gold Tip submits that the Utah County Attorney's Office conducted a formal criminal investigation that could have resulted in serious consequences for Mr. Zelenovic and the company if it had developed into a formal criminal indictment.[50] Thus, Gold Tip argues that the investigation was either a "criminal proceeding" or a "proceeding brought or initiated by a . . . local government agency."[51]

Utah case law provides little guidance as to how to interpret the term "proceeding" within the insurance context. This court has held that "[i]n a diversity action such as this, absent a decision of the state's highest court directly on point, the court must predict how the Utah Supreme Court would decide this case."[52]

*Black's Law Dictionary* defines "proceeding" in pertinent part as:

1. The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment. 2. Any procedural means for seeking redress from a tribunal or agency. 3. An act or step that is part of a larger action. 4. The business conducted by a court or other official body; a hearing.[53]

Although these definitions provide some guidance on the term's meaning, they do not conclusively resolve whether a criminal investigation can be properly classified as a "proceeding." According to Carolina, the definitions suggest that a "proceeding" occurs only

---

[49](*See* Def.'s Mem. at 6.)

[50](*See* Pl.'s Mem. at 1–2.)

[51]*Id.* at 8.

[52]*Allstate Ins. Co. v. Patterson*, 904 F. Supp. 1270, 1278 (D. Utah 1995).

[53]*Black's Law Dictionary* 1324 (9th ed. 2009).

after the commencement of a formal legal action.[54]  However, Gold Tip references the third

definition within *Black's Law Dictionary*:[55] "[a]n act or step that is part of a larger action"—a

definition which casts doubt on Carolina's assertion that the term's ordinary meaning refers to a

formally initiated lawsuit.

In support of their interpretations, the parties rely primarily on persuasive cases from

other jurisdictions.  Many courts have defined the term "suit,"[56] but only a few cases have

commented specifically on the meaning of "proceeding" in insurance policy language.

When a government entity conducts an investigation and requests action from the

subjects of its investigation, that process may plausibly be viewed as a "proceeding brought or

initiated by . . . a local government agency."[57]  In *Monarch Greenback, LLC v. Monticello*

*Insurance Company*, a company sought defense and indemnity from its insurer after the

---

[54](*See* Def.'s Mem. at 6.)

[55](*See* Pl.'s Mem. at 11.)

[56]*Solo Cup Co. v. Fed. Ins. Co.*, 619 F.2d 1178, 1188 n.7 (7th Cir. 1980) (noting that the term "suit" was ambiguous and that the duty to defend suits "might in some circumstances be triggered by adjudicatory proceedings before an administrative body"); *Joslyn Mfg. Co. v. Liberty Mut. Ins. Co.*, 836 F. Supp. 1273, 1279 (W.D. La. 1993) (determining that compliance orders issued by the Department of Environmental Quality did not rise to the level of a "suit"); *Emp'rs Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1130 (Ill. 1999) (holding that neither a potentially responsible party letter, a draft consent order, nor a "no-action" letter constituted a "suit" under Illinois' bright-line test that defined a suit as "a proceeding in a court of law"); *Campbell Soup Co. v. Liberty Mutual Ins. Co.*, 571 A.2d 1013, 1020–21 (N.J. Super. Ct. Ch. Div. 1988) (concluding that a conciliation proceeding was not a "suit" because it was voluntary and not coercive).

[57]*Cf. Monarch Greenback, LLC v. Monticello Ins. Co.*, 118 F. Supp. 2d 1068, 1074 (D. Idaho 1999); *accord Joseph P. Bornstein, LTD v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 828 F.2d 242, 245 (4th Cir. 1987) (holding that a grand jury investigation and post-indictment proceedings were "proceedings brought by government regulatory agencies seeking nonpecuniary relief").

Environmental Protection Agency (EPA) investigated the company and issued orders directing

the company to clean up an environmental hazard.[58] Because a lawsuit "would have surely

followed" if the company had not cooperated with the orders, the court concluded that the EPA's

actions were "civil proceedings" covered by the company's insurance policy.[59] Similarly, the

Utah County Attorney's Office investigated Mr. Zelenovic and requested assistance from Gold

Tip in the investigation. If Gold Tip had not cooperated in the investigation, the county attorney's

office would have likely filed an information against Mr. Zelenovic. Thus, like the EPA actions

in *Monarch Greenback*, the investigation of Gold Tip can plausibly be considered a "proceeding"

under the policy language.

In another case, *Onvoy, Inc. v. Carolina Cas. Ins. Co.*, a federal court in Minnesota

concluded that a grand jury subpoena was a "proceeding brought or initiated by a federal, state or

local government agency."[60] The court held that Carolina had "failed to meet its burden to show

that the subpoena clearly falls outside the policy's coverage."[61] Thus, Carolina had a duty to

---

[58]*Monarch Greenback*, 118 F. Supp. 2d at 1070–71.

[59]*Id.* at 1075–76. In evaluating a related issue, the court concluded that a letter from a
private organization demanding compensation for property damage resulting from the
environmental hazard was *not* a "civil proceeding." *Id.* at 1075. Carolina applies this reasoning to
the case at bar and suggests that the letters from the Utah County Attorney's Office were similar
to the demand letter Monarch Greenback received. However, unlike the demand letter in that
case, the letters Gold Tip received were from a *government* agency that was conducting a formal
investigation of the company. This is different from a demand for compensation from a *private*
organization.

[60]*Onvoy, Inc. v. Carolina Casualty Ins. Co.*, 2006 WL 1966757, at *3 (D. Minn. July 11,
2006).

[61]*Id.*

cover the defense costs Onvoy incurred in the grand jury proceedings even though a formal indictment was never returned.[62]

 Similar to the grand jury investigation in *Onvoy*, the Utah County Attorney's Office investigated allegations that Mr. Zelenovic had engaged in criminal activity. In the course of this investigation, Gold Tip incurred costs defending Mr. Zelenovic even though a formal indictment was never issued. Carolina seeks to distinguish the present case from *Onvoy* by pointing out that Mr. Zelenovic never received a formal subpoena,[63] and thus Gold Tip was never compelled to provide a defense to the investigation.[64]

 However, if an insurer does not have a duty to defend until a government agency formally files a lawsuit against the insured, then the insured will have an incentive to refuse to cooperate

---

[62]*See id.*

[63](*See* Tr. of Hr'g at 19:22–20:14):

MR. SANDERS: And in the *Onvoy* case, the unpublished case that Mr. Sanders

referred to, there's a grand jury proceeding going on. . . . And a subpoena is issued, and there's a required formal response, the written demand, if you will, to the subpoena. Here the county attorney just asked, "Can I see some documents?" And as we heard Mr. Snow, they on their own generate documents and take them apparently into the county attorney.

Keep in mind that the county attorney under title 77 chapter 21 of the Utah Code

has the authority to issue an investigative subpoena. And so the argument would work better that if the county attorney had issued a subpoena, that's more like the grand jury in the *Onvoy* case, and there's something official to respond to. But just this conversation of this investigation we suggest isn't—isn't a proceeding. It is exactly that word. It's an investigation. And the policy doesn't insure against investigations.

[64](*See id.*)

with the agency until it files an action in court.[65]  The initiation of a formal legal action might

significantly increase costs of defense, while cooperation at early stages of the process would

often limit those costs and serve the economic interests of both insured and insurer.[66]

Accordingly, in *Quaker State*, this court determined that a liberal construction of the term "suit"

would encourage the insured company to cooperate with the EPA's administrative actions and

avoid unnecessary costs.[67] If Gold Tip's defense costs were not covered simply because a formal

subpoena was never issued, then Gold Tip would have had an incentive to refuse to cooperate in

the investigation. As a result, the Utah County Attorney's Office likely would have taken further

steps to compel the company's cooperation, and an indictment may have followed. This could

have resulted in significantly greater defense expenses—an outcome that would not have

benefited either of the parties in the present case. Thus, public policy suggests that the term

"proceeding" should *not* be limited to situations where a formal subpoena has been issued.

Instead, the term's ambiguity should be resolved in favor of the insured.

 In a related case, an insured sued its insurer for coverage, claiming that a grand jury's pre-

indictment investigation constituted a "proceeding[] brought by a government regulatory agency

seeking nonpecuniary relief."[68] The insurance company argued that the grand jury investigation

---

[65] *See Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278, 1307 (D. Utah 1994).

[66] *Id.* at 1307–08.

[67] *See id.* at 1307–10.

[68] *See Joseph P. Bornstein, LTD v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 828 F.2d 242, 243–44 (4th Cir. 1987).

was not a covered "proceeding" because "the purpose of the investigation was to gather information, not to seek nonpecuniary relief."[69]  The Fourth Circuit held that both parties "offered reasonable, though conflicting, constructions of the relevant policy language."[70] Accordingly, the court resolved the ambiguity in favor of the insured.[71] Similarly, both Gold Tip and Carolina have offered reasonable constructions of "proceeding brought or initiated by a . . . local government agency." Gold Tip argues that the term "proceeding" encompasses the investigation, while Carolina argues that the term's plain meaning is more narrow. However, as in *Bornstein*, the ambiguity created by the two plausible interpretations should be resolved in favor of the insured.

### The Language "including, but not limited to" Plausibly Encompasses the Investigation

The parties also disagree over the effect of "including, but not limited to" in the policy's definition of "Claim." According to Gold Tip, even if the investigation was not a "proceeding" expressly referenced by the terms of the policy, the phrase "including, but not limited to" expanded the definition of "Claim" to include the investigation by the Utah County Attorney's Office.[72]  Carolina points out that both of the examples that follow the phrase "including, but not

---

[69]*Id.* at 244.

[70]*Id.* at 245.

[71]*Id.*

[72](*See* Pl.'s Mem. at 10.)

limited to" are "proceedings."[73]  Thus, Carolina argues that "including, but not limited to" was

simply meant to illustrate the types of "proceedings" that were covered by the policy, and

because the investigation was not a "proceeding" in Carolina's view, it was not a covered

"Claim."[74]

The phrase "including, but not limited to" generally "renders the listed categories

illustrative but not exhaustive."[75] In *Blais v. Hartford Fire Insurance Company*, an insurance

policy provided the following definition:

> A "non-owned auto" is an "auto" you do not own including but not limited to:
> 1. An "auto" that you lease, hire, rent or borrow;
> 2. A customer's "auto" that is in your care, custody, or control for service; and
> 3. An "employee's" "auto" while used in your business or personal affairs.[76]

The *Blais* court determined that the phrase "including but not limited to" suggested that the list

---

[73](*See* Tr. of Hr'g at 33:6–12):

MR. SANDERS: That phrase but not limited to doesn't do anything in the context

of this case because, first, the word criminal is already included in there and,
secondly, it brings us right back to the definition of the proceeding, that is,
including but not limited to, and then it lists proceedings—uses that word,
proceedings. And so that becomes more academic than significant.

[74](*Cf. id.*)

[75]*Blais v. Hartford Fire Ins. Co.*, 2011 WL 1303135, at *10 (D. Mass. Mar. 30, 2011);

*accord Merrick Young Inc. v. Wal-Mart Real Estate Bus. Trust*, 682 Utah Adv. Rep. 37, ¶¶
21–22, 257 P.3d 1031, 1037–38 (Utah Ct. App. 2011) (finding that the phrase "including but not
limited to" in a settlement agreement was a "common catch-all phrase" that was used "in case
any asset was inadvertently missed").

[76]*Blais*, 2011 WL 1303135, at *10.

did not encompass all of the "non-owned autos" that were excluded from insurance coverage.[77] Instead, the list gave examples of the kinds of autos that were "non-owned."[78]  However, the court determined that this expansive phrase made the boundary between covered autos and non-covered autos ambiguous.[79]

In the instant case, the phrase "including, but not limited to" suggested that the list provided examples of the types of "written demands" that were covered by the policy, but the language did not necessarily confine coverage to only those "written demands" described in the list. Similar to *Blais*, the phrase "including, but not limited to" obfuscated the boundary between covered "written demands" and non-covered "written demands," thus rendering the Carolina insurance policy's language ambiguous. Given that the investigation can plausibly be considered a "written demand," this ambiguity should be resolved in favor of Gold Tip.

Further, if Carolina intended to limit the definition of "Claim" to cases in which a formal indictment had been issued, it could have done so explicitly.[80] Under Utah law, an "insurer may exclude from coverage certain losses by using language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will

---

[77] *See id.*

[78] *Id.*

[79] *Id.*

[80] *See Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1275 (Utah 1993).

not be provided."[81] In *Alf*, the Utah Supreme Court found that an insurance policy's language specifically excluded coverage for damage resulting from earth movement.[82] By contrast, Carolina did not clearly and unmistakably communicate that pre-indictment investigations were excluded from the definition of "Claim." Instead of limiting the insurance policy's coverage, Carolina included the expansive phrase "including, but not limited to" when it described the types of "written demands" that qualified as "Claims." This language rendered the term "Claim" ambiguous. This ambiguity should be resolved in Gold Tip's favor, and the investigation should be included as a covered "Claim" under the insurance policy.

### CONCLUSION

In light of the foregoing, it is clear that defendant is required to reimburse Mr. Zelenovic with the "reasonable and necessary fees, costs and expenses . . . resulting solely from the investigation."[83] Having refused to reimburse these reasonable and necessary fees, costs and expenses, defendant has breached its contract with plaintiff.[84]

Having determined that defendant is liable to plaintiff under a cause of action for breach of contract, it also follows that plaintiff is entitled to declaratory relief. Also, because the court

---

[81] *Id.* (quoting *Village Inn Apartments v. State Farm Fire & Cas. Co.*, 790 P.2d 581, 583 (Utah Ct. App. 1990)) (internal quotation marks omitted).

[82] *Alf*, 850 P.2d at 1275.

[83] (Def.'s Mem. Ex. J at DEF0036.)

[84] "An insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts." *Alf*, 850 P.2d at 1274. "[W]hat the insured has bargained for in the context of an insurance contract includes both peace of mind and the insurance company's payment of whatever sum is owed within a reasonable period of time." *Machan v. UNUM Life Ins. Co. of Am.*, 528 UT Adv. Rep. 20, ¶ 13, 116 P.3d 342, 345 (Utah 2005) (internal quotations omitted).

has ruled in favor of plaintiff's claims for breach of contract and declaratory relief, the court need not decide plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

Further, as a prevailing party in this breach of contract action, plaintiff is entitled to recover reasonable attorney's fees for the costs of filing this lawsuit and cross-motion for summary judgment. Although Utah has traditionally adhered to the rule that attorney fees "generally cannot be recovered unless provided for by statute or by contract,"[85] the Utah Supreme Court has noted that when parties create an insurance contract, it is reasonably foreseeable that an insured will incur attorney fees suing its insurer if the insurer fails to perform the contract.[86]

For the reasons explained above in some detail,

**IT IS ORDERED** that defendant's motion for summary judgment is **DENIED**; and

**IT IS FURTHER ORDERED** that plaintiff's cross-motion for summary judgment is **GRANTED**;

The court will **RESERVE** as to the questions of the reasonableness of claimed fees, expenses, and costs related to plaintiff's defense of the Utah County Attorney's Office investigation, as well as attorney's fees to be awarded, if any, to plaintiff for its status as a prevailing party in this breach of contract action for further hearing to be set at the court's convenience.

---

[85] *Canyon Country Store v. Bracey*, 781 P.2d 414, 419 (Utah 1989).

[86] *See Zions First Nat'l Bank v. Nat'l Am. Title Co.*, 749 P.2d 651, 657 (Utah 1988) (stating that attorney fees may be recovered when an insurer breaches an implied contractual obligation to perform an insurance contract fairly and in good faith).

2:11-cv-765

DATED this 23rd day of August, 2012.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge